UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Arturo E. Martinez,
an individual residing in Minnesota,

       Plaintiff,

v.                                                Civil No. 09-2925 (JNE/JJK)
                                                ORDER

W.W. Grainger, Inc., an Illinois
Corporation,

       Defendant.

David E. Wandling, Esq., Wandling Law Group, PC, appeared for Plaintiff Arturo E. Martinez.

Robert R. Reinhart, Esq., and Jana E. Bruder, Esq., Dorsey & Whitney LLP, appeared for Defendant W.W. Grainger, Inc.

      Arturo E. Martinez brings this employment discrimination action against his former employer, W.W. Grainger, Inc. (Grainger). Martinez claims that Grainger fired him and paid him less than similarly-situated employees because of his race and national origin in violation of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 1983 (2006), 42 U.S.C. § 1981 (2006), and the Minnesota Human Rights Act (MHRA). Martinez also asserts claims under state law for defamation, breach of contract, and promissory estoppel. The case is before the Court on Grainger's motion for summary judgment. On December 9, 2010, the Court heard the motion. For the reasons set forth below, the Court grants Grainger's motion and dismisses Martinez's claims with prejudice.

# I. BACKGROUND

Grainger is an Illinois corporation that sells facilities maintenance products through a network of branch stores and distribution centers.[1] It also offers on-site inventory management to its customers. Martinez began working for Grainger in 1994 while he was attending Penn State University. After he graduated, Martinez took a full-time position with Grainger as a "Customer Service Associate" in Pennsylvania. After about a year, Grainger transferred him to Plymouth, Minnesota. After several promotions, Martinez became the manager of the Minneapolis branch. Shortly thereafter, Martinez took a position as manager of the new St. Cloud branch. In January 2002, after an intermediate transfer, Martinez moved again to become the manager of the St. Paul branch.

Each of Grainger's branches is assigned to a district. The district that contains Minnesota's branches also contains branches in Iowa and the Dakotas. In April 2002, Jeff Timm became the "District Branch Services Manager" for Minnesota's district. Timm was Martinez's supervisor and was responsible for setting Martinez's salary, raises, and bonuses. The parties dispute whether Timm was responsible for promoting Martinez to the St. Paul branch manager position. Martinez states that Timm was responsible for hiring branch mangers, but Martinez also claims that Timm did not support hiring Martinez for the St. Paul job. Citing "pages 38-39" of Timm's deposition, Martinez asserts that "Timm candidly admits he did not pursue or support the hiring of Martinez as the St. Paul branch manager." Martinez did not include those pages in his submissions to the Court. Grainger did include the missing pages from Timm's deposition with its reply, and the testimony cannot be read to support Martinez's assertion. In fact, Timm's testimony establishes that he did promote Martinez and that his reason for doing so was

---

[1] Facts are uncontested unless otherwise indicated.

Martinez's familiarity with Grainger's business and policies. For instance, Timm testified that "I hired Art to manage the St. Paul branch," (Bruder Supp. Decl. Ex. A, Timm Dep. 25), and he described "[t]he decision that I made to put Art in St. Paul," (Timm Dep. 38).

Evaluations of Martinez's work performance as St. Paul branch manager were mixed. In a review of Martinez's 2005 performance, Timm stated that Martinez's "[o]verall performance continues to meet expectations" and that Martinez's strengths included "[c]oaching and aligning performance to hard skills and tasks." (Wandling Decl. Ex. E at 1) In that same review, however, Timm stated that Martinez needed to work on "[c]ommunication to drive understanding and commitment to our objectives." From 2005 to 2009, Timm criticized Martinez for failing to inspire and lead employees to perform better. (Wandling Decl. Ex. E at 1-2, 4, 7, 10) Martinez complains that Timm refused to give specifics when Martinez sought guidance from Timm on how to correct these problems. (Martinez Decl. ¶ 15) Martinez asserts that Timm, through the performance evaluations, expressed increasing concern with his performance over time.

In early July 2009, when Martinez was on vacation, Timm noticed customers waiting for service at the St. Paul branch. Timm noticed that employee Jeff Dehn was in the office and did not appear to be working. Timm asked Dehn why he was not helping the customers, and Dehn replied that it was not his start time and that he was not supposed to work overtime. Timm told Dehn that he should help the waiting customers and that he would be compensated. After this exchange, Timm became concerned that employees were working overtime without reporting it for fear of being reprimanded. Timm discussed the issue with the St. Paul employees. He followed up the discussion with an email, which was copied to Martinez, instructing them to use their own judgment to decide whether good customer service required them to work outside of

3

their schedules. He further instructed them to report all of the time they worked. (Timm Decl. ¶¶ 17-21) Martinez asserts that Timm's actions undermined Martinez's authority with the employees because it was Timm's policy to maintain strict limitations on overtime by requiring employees to obtain management's approval before working overtime.

Timm became concerned by the reactions of the St. Paul branch employees. He noted a "look of surprise and fear in [their] eyes" when he discussed the overtime issue with them. (Timm Decl. ¶ 20) According to Timm, the employees suggested that Martinez was being too harsh with them, that Martinez was yelling at them, and that they were afraid of Martinez. Timm decided to investigate the problem and contacted Joyce LePage with Grainger's human resources department. Timm met briefly with the employees and explained to them that someone from human resources was going to speak with them. Martinez maintains that Timm "attempted to influence their testimony prior to Ms. LePage's arrival." (Martinez's Br. 12) In support of this proposition, Martinez cites the deposition testimony of several employees and hearsay in his own declaration. Some of the pages cited by Martinez are not included in his exhibits, and none of the testimony supports the conclusion that Timm tried to influence the employees. Martinez also points out that Timm gave Martinez's evaluations to LePage before the investigation.

On July 9, 2009, LePage spoke with St. Paul branch employees Sandy Schmidt, Courtney Ehlers, Bruce Willie, Ben Talalla, Aimee Hallen, James Connolly, and Jeff Dehn about Martinez. She took extensive notes during the interviews; copies of the hand-written notes and LePage's transcription of them were submitted with her declaration. (LePage Decl. ¶¶ 12-18, Ex. D) Many of the employees' recorded comments were positive (e.g., "[v]ery customer focused," "fair w/me"), and LePage was left with the impression that "the employees like [Martinez] as a person," (Wandling Decl. Ex. U, LePage Dep. 141). Most of the comments,

4

however, were negative. These comments included: "not a lot of patience"; "[p]eople are fearful—looking over their shoulders"; "[m]anage by intimidation and threats"; "hostile"; "[d]on't know what will set him off"; "[t]emper"; "[t]alks down to me—like a 2 year old"; "[h]e's more intense than he needs to be"; "[c]onfusing, micromanaging, critical, nothing positive"; "brutal and belittling"; "[t]reated James like a <u>kid</u> or <u>an idiot</u>"; "demeaning"; "intimidated by him"; and "[f]rustration builds up then boom." (LePage Decl. ¶¶ 12-18, Ex. D) All of the interviewed employees except for Schmidt testified during their depositions that they made or would have made statements consistent with LePage's notes. (Bruder Decl. Ex. K, Connolly Dep. 130-36; Ex. L, Dehn Dep. 71-73; Ex. M, Ehlers Dep. 64-68; Ex. N, Hallen Dep. 99-105; Ex. Q, Talalla Dep. 50-62; Ex. R, Willie Dep. 89-94) Schmidt, however, distanced herself somewhat from LePage's notes of her interview. For example, she stated that much of what she told LePage was based on hearsay and that she did not think she would have had any reason to say that Martinez threatened anyone. (Bruder Decl. Ex. O, Schmidt Dep. 65-73)

Beyond confirming LePage's notes, the employees' deposition testimony describes Martinez as micromanaging, demeaning, moody, unapproachable, and unpredictable. (Connolly Dep. 97, 108; Dehn Dep. 15-16, 67; Ehlers Dep. 21-22, 52; Hallen Dep. 40, 86-87, 92-93; Willie Dep. 77)[2] Dehn also described the environment caused by Martinez's management style as hostile and fear-based. (Dehn Dep. 67) Ehlers gave similar testimony: "It was more hostile, hostile in the sense you don't know if Art [Martinez] would come, would change from a nice guy to Jekyll and Mr. Hyde. You don't know who is the victim of the day, you know." (Ehlers Dep. 27) Some of the employees also described incidents of Martinez yelling at employees. (Dehn Dep. 52) Martinez offers no evidence suggesting that these employees did not perceive him in

---

[2] Grainger also cites page 109 of Hallen's deposition, but page 109 is missing from Grainger's exhibit. Nevertheless, the other pages cited by Grainger support its assertion.

5

these ways, nor does he offer any evidence suggesting that they did not communicate these perceptions to LePage.

After LePage finished the employee interviews, she met with Timm to discuss how to handle the situation. Timm and LePage discussed the seriousness of the problem and whether Martinez could overcome the issues. (Wandling Decl. Ex. A, Timm Dep. 105-06) They decided that Martinez could be successful only if he took "ownership" of the problem. (Timm Dep. 103-06, 112-13; Wandling Decl. Ex. U, LePage Dep. 125-26) Timm's and LePage's declarations and deposition testimony make clear what they meant by "taking ownership" of a problem: "taking ownership" of a problem is admitting the behavior or, at a minimum, admitting the employees' negative perceptions and then taking responsibility for changing the behavior or employees' perceptions. If Martinez did this then they thought a "very well-defined performance improvement plan" (PIP) or counseling with a third party could have been appropriate. They also discussed termination as an option. Martinez asserts that "LePage and Timm agreed that they would . . . demand that [Martinez] admit to the allegations, and terminate him immediately if he refused." (Martinez's Br. 13) The citations that Martinez claims stand for this proposition do not. Instead, Timm and LePage wanted Martinez to acknowledge the problem and "take ownership" of it. Timm stated in his deposition that if Martinez would have recognized that the employees had these negative perceptions of Martinez—without recognizing the underlying events—then Timm could have implemented a PIP.

Timm and LePage met with Martinez on July 10, 2009. LePage produced a bullet-point summary of the issues she had uncovered during her interviews. (LePage Decl. Ex. E) The list included the following summaries: "[p]eople are fearful"; "[y]ells and screams"; "raging mad and almost violent"; "[m]anage by intimidation"; and "[d]emeaning." Martinez asserts that

LePage presented the summary to him and demanded that he admit the allegations. (Martinez Decl. ¶¶ 28, 34) In his declaration, Martinez states that after he refused to issue a blanket admission, he was called in for a second meeting and fired. At his deposition, Martinez also testified that Timm asked him what Martinez would do if Martinez returned to work the following Monday. Martinez initially testified that he responded by saying that he "would have to make some changes" and that he meant this to mean that he would have to change his management style. (Bruder Decl. Ex. D, Martinez Dep. 194) When pressed, however, Martinez admitted that he did not remember whether he said he would have to change or whether there would have to be some changes. (Martinez Dep. 199) After Martinez equivocated, defense counsel asked:

> But I'm going to press you a little bit because this is an awfully central point, and we're on the cusp of a potential tragedy here.
> But are you really saying that you said to them, I will change, because you understand if they had heard you to say that, you would not have been fired?

Martinez responded: "I, I don't know what I said, Rob." (Martinez Dep. 200)

Timm states in his declaration that Martinez was surprised by the summary list and, with the exception of micromanaging, denied that he had engaged in any of the behavior. According to Timm, Martinez asked for clarification and examples of the behavior in the summary list. Timm and LePage provided Martinez with two examples where Martinez was hostile or demeaning. Timm also described how he asked Martinez what Martinez would do if Martinez were allowed to return to work on Monday. Timm states that, in responding, Martinez's "focus was on the employees as the problem" and that Martinez said "he would have to make changes." (Timm Decl. ¶ 30) It is unclear from the declaration whether Martinez's statement was meant to communicate the necessity of changing his behavior or *making* changes in others. Timm states that he did not have a sufficiently "strong sense" that Martinez acknowledged the behaviors in

the list or the employees' negative perceptions. (Timm Decl. ¶ 30) Timm further states that he asked Martinez what he would do if he were in Timm's place and that Martinez responded that he did not know.[3] LePage's declaration is consistent with Timm's.

After being fired, Martinez sought therapy to help him deal with the stress of losing his job. He told the medical care provider that he was fired for "yelling and belittling employees" but he also denied the behavior.

Martinez asserts that his salary was consistently less than the salaries of similarly-situated branch managers. In support of his argument, Martinez relies on two exhibits, H and X, to the declaration of David E. Wandling. He cites Exhibit H for the proposition that the St. Paul branch is the sixth largest in Timm's district. Exhibit H is a collection of spreadsheets that show various data for Timm's branches from 2007 to 2009. The data appear to relate mainly to originated sales and invoiced sales. Martinez does not explain what these data are, and he does not explain why the data suggest that St. Paul is the sixth largest branch. In short, he cites nothing in the record to establish that St. Paul is the sixth largest branch. During his deposition, Timm testified that the St. Paul branch is and always has been "on the small end," similar to the Rochester, St. Cloud, Sioux City, and Minneapolis branches. (Timm Dep. 57, 60) In contrast to Exhibit H, Timm described how the branches are ranked as level I, II, or III, I being the smallest and III being the largest. From 2003 to 2006, the branch levels were determined by number of employees and sales, and, beginning in 2007, the levels were determined solely by number of employees. Timm described the St. Paul branch as a "high L1 or low L2." (Timm Dep. 55) Timm also described salary range targets for branch managers for each particular level. Timm could not identify the particular ranges, but he stated that the ranges overlapped and that the

---

[3]     Martinez testified that it was possible that he made this response.

overall range was between $60,000 and $100,000. (Timm Dep. 47-48) Timm mentioned that he worked to ensure that a given branch manager was within the target range for the particular level and that it "would have been a real exception if" a salary was outside of the range. (Timm Dep. 76)

Martinez cites Exhibit X to support his theory that Martinez was paid substantially less than similarly-situated branch managers. Exhibit X contains 25 pages of tables and spreadsheets. Martinez does not include a single pincite in any of his citations to the exhibit, leaving the Court to guess where in the pages of data and tables the support for a given proposition appears.[4] Exhibit X's top document, a two-page spreadsheet purporting to summarize branch-manager salaries from 2003 to 2009, does not have a "Bates" number and does not appear to have been produced by one of the parties during discovery. At the hearing, Martinez indicated that the document was a summary created by Martinez's counsel, but nothing in Martinez's written materials indicates that this was the case. Exhibit X also contains numerous terms that Martinez does not explain or define—for example, the difference between MRR salary and MRP salary is unexplained.

The target salary ranges for each branch level are central to Martinez's allegation that he was paid less than similarly-situated branch managers. Exhibit X's summary document lists the target salary ranges for levels I-III and actual branch manager salaries for years 2003 to 2009. Although there is some support for the target ranges in the pages that follow (page 9 of Exhibit X indicates target salary ranges for levels I-III for 2003), the origin and accuracy of the target ranges are unclear because Martinez provides little explanation of the documents. Furthermore,

---

[4] Martinez's lack of pincites was problematic throughout his brief. Martinez opened his fact section by stating that facts were derived from Martinez's declaration unless otherwise indicated. Thus, every time Martinez made a factual contention without a citation, the Court was forced to search through his 15-page declaration.

aside from the above-mentioned 2003 ranges, the Court has not been able to discern the source of the other target ranges. Exhibit J to Timm's Declaration also provides salary information. Exhibit J, which is based on Timm's personal knowledge, lists actual salaries for the branch managers in his district from 2006 to 2009. These numbers are basically in agreement with those found in the summary document of Martinez's Exhibit X. During this time period, Martinez was paid about the same as the St. Cloud branch manager, and more than the Minneapolis, Sioux City, and Rochester branch managers. (Timm Decl. Ex. J) Also, when Martinez was hired, he started at a salary greater than the outgoing Caucasian manager, Geoff Brown.

## II. DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

**A.     Section 1983, denial of promotion, reprisal, defamation, and promissory estoppel claims**

Martinez does not respond to Grainger's arguments bearing on several of his claims. First, Grainger argues that there is no state actor here and there is therefore no actionable § 1983 claim. Second, Grainger argues that any Title VII or MHRA claims based on the denial of

Martinez's requested "promotion" to the Arden Hills branch fails because of the statute of limitations. Martinez's last request for reassignment to Arden Hills was in July 2008. (Timm Decl. ¶ 57) Martinez's EEOC charge is dated August 2009, after the limitation periods of Title VII and the MHRA had passed. Third, Grainger asserts that Martinez can point to nothing in the record supporting his allegation that Grainger retaliated against him for engaging in a protected activity. Fourth, Grainger argues that Martinez's defamation claim fails because he can point to nothing in the record supporting his assertion that Grainger made any false statements to a third party. Fifth, Grainger argues that Martinez's promissory estoppel claim fails because he can point to nothing supporting his allegation that Grainger made promises upon which he reasonably relied to his detriment. Martinez makes no response to any of these arguments, and, at the hearing, he indicated that he would forfeit these claims. The Court concludes that summary judgment on these claims in Grainger's favor is proper.

**B.    Disparate treatment claims**

Based on Grainger's actions related to Martinez's termination and the alleged salary discrepancy, Martinez asserts that Grainger discriminated against him on the basis of his race and national origin in violation of Title VII, § 1981, and the MHRA. Title VII provides that it is "an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1) (2006). The MHRA states that "it is an unfair employment practice for an employer, because of race [or] national origin . . . to . . . discharge an employee" or to "discriminate against a person with respect to hiring, tenure, compensation,

11

terms, upgrading, conditions, facilities, or privileges of employment." Minn. Stat. § 363A.08, subd. 2 (2010).

The Court analyzes Martinez's Title VII, § 1981, and MHRA claims using the same framework. *See Kasper v. Federated Mut. Ins. Co.*, 425 F.3d 496, 502 (8th Cir. 2005) (Title VII and MHRA cases analyzed in the same manner); *Davis v. KARK-TV, Inc.*, 421 F.3d 699, 703-04 (8th Cir. 2005) (Title VII and § 1981 cases analyzed in the same manner). Accordingly, Martinez may avoid summary judgment with direct evidence of discrimination or by "creating the requisite inference of unlawful discrimination" under the framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004). Because Martinez does not argue that there is direct evidence of discrimination, the Court proceeds under the *McDonnell Douglas* framework.

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of discrimination. To establish a prima facie case of disparate treatment, Martinez must show "(1) that he is a member of a protected class; (2) that he was qualified for his position and performed his duties adequately; and (3) that he suffered an adverse employment action under circumstances that would permit the court to infer that unlawful discrimination was involved." *Sallis v. Univ. of Minn.*, 408 F.3d 470, 475-76 (8th Cir. 2005); *see also Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 850-51 (8th Cir. 2005). An inference of unlawful discrimination may be established by demonstrating that similarly-situated employees of a different race or national origin were treated differently. *See Rodgers*, 417 F.3d at 850-51. "[O]nce the plaintiff employee establishes a prima facie case of discrimination, the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions." *Gilbert v. Des Moines Area Cmty. Coll.*, 495 F.3d 906, 914 (8th Cir. 2007). If the defendant offers a legitimate,

nondiscriminatory reason, "the burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered explanation is a pretext for unlawful discrimination." *Id.*

    1.    Termination

The Court first considers the allegations related to Martinez's termination. Martinez contends that Grainger investigated him, insisted that he admit the problems listed in LePage's summary, refused to implement a PIP, and refused to give him a new position in Grainger because of his race and national origin. For the purposes of summary judgment, the Court assumes without deciding that Martinez has established a prima facie case regarding these allegations.

Grainger has articulated a legitimate, nondiscriminatory reason for these actions. Namely, Timm began to suspect that Martinez's management style was inconsistent with Grainger's reasonable expectations. Martinez's subordinates confirmed these suspicions when interviewed, and Martinez was fired because he refused to "take ownership" of the problems. This legitimate reason is supported by Timm's and LePage's declarations and depositions. And it is supported by LePage's notes of her interviews with the employees—notes that were almost universally affirmed by the interviewees.

Martinez contends that this reason was pretext. There are at least two ways a plaintiff can establish a material question of fact on the issue of pretext. *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006). Plaintiffs may do so with evidence that the employer's reason is "unworthy of credence, because it has no basis in fact," *id.* (quotation marks and citations omitted), or by "persuading the court that a [prohibited] reason more likely motivated the employer," *id.* (quotation marks and citations omitted). Here, Martinez argues that he has shown pretext based on more favorable treatment of similarly-situated employees who

13

were not of Martinez's race or national origin.  At the pretext stage,[5] Martinez must prove he was similarly situated to the other employees "in all relevant respects."  *Rodgers*, 417 F.3d at 853 n.5.  "[T]he burden for establishing 'similarly situated' at the pretext stage is rigorous."  *Wheeler v. Aventis Pharm.*, 360 F.3d 853, 857 (8th Cir. 2004).

Martinez alleges that he was fired under circumstances that allow an inference of unlawful discrimination because similarly-situated, non-Hispanic managers were not fired but were placed on PIPs or otherwise allowed to continue their employment with Grainger.  Each of the employees cited by Martinez was not similarly situated to him.  Reading the record in the light most favorable to Martinez, a jury could conclude that Timm began to suspect there was a problem with Martinez's management style and with overtime after Timm interacted with St. Paul employees while Martinez was on vacation.  Timm asked LePage to conduct an investigation.  At least six employees complained to LePage of serious problems with Martinez's management style.  The complaints contained common themes: Martinez was micromanaging, short-tempered, moody, unpredictable, unapproachable, belittling, demeaning, etc.  Timm and LePage met with Martinez.  After the meeting, they concluded that Martinez did not take sufficient "ownership" of the serious problems he was having with his subordinates.  Martinez does not deny this.  Instead, he asserts that he refused to admit the allegedly untrue allegations about his behavior and that he does not remember whether he responded to Timm and LePage by saying *things* needed to change or that *he* needed to change.  This is not enough to contest

---

[5] There are two lines of Eighth Circuit cases establishing the standard for determining whether employees are "similarly situated" at the *McDonnell Douglas* prima facie stage. *Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009).  "One line sets a 'low threshold,' requiring only that the employees are 'involved in or accused of the same or similar conduct and are disciplined in different ways.'  The other line requires that the employees be 'similarly situated in all respects.'"  *Id.*  The Eighth Circuit uses the latter at the pretext stage.

Timm's and LePage's assertion that Martinez did not "take ownership" of the problems. (Timm Decl. ¶ 30)

Each of the five employees cited by Martinez as being similarly situated to him is different in relevant ways. For example, Martinez points to Exhibit Z to Wandling's declaration as evidence of three separate issues with Jeanine Weinreis. First, the record contains a letter, dated 1998, from one of Weinreis's subordinates. The subordinate complains about Weinreis's management style while Weinreis was working at the Madison, Wisconsin, branch. The letter, appearing in the record as the first three pages of Exhibit Z, was from a single employee—in contrast to the half-dozen who complained about Martinez. Even more to the point, Martinez points to no evidence suggesting that Timm ever supervised the Madison branch. Martinez also asserts that the Madison employee described how he and the other employees were "very uncomfortable" with Weinreis. Martinez did not provide a pincite for this quotation, and the Court searched through Exhibit Z's pages of single-spaced text and was unable to find it. The best support for the assertion that the Court found is the employee's statement that he was "extremely uncomfortable with the shape of the working resolution for this matter." (Wandling Decl. Ex. Z at 2)

Second, the record contains evidence of disciplinary action against Weinreis for purchasing a table for her office and for taking a computer with her when she was transferred. This evidence lends no support to Martinez's similarly-situated argument because the problems are not similar in any way to Martinez's.

Third, the record contains emails, dated 2005, from Timm to Weinreis discussing his concerns with her management of the Duluth branch. The emails indicate that Timm put Weinreis on a PIP because of problems with her management style. Martinez, however, neither

15

alleges nor points to evidence suggesting that Weinreis failed to acknowledge or "take ownership" of her problems such that a PIP would not have been appropriate. Further, the record suggests that, once placed on a PIP, Weinreis was cooperative: Timm states that he "appreciat[ed]" Weinreis's "effort and commitment . . . to develop [her] skills and close the performance gaps." (Wandling Decl. Ex. Z at 5) Timm also remarked that he was "pleased that [Weinreis is] committed to improving." (Wandling Decl. Ex. Z at 7) Accordingly, Martinez has failed to produce evidence allowing a jury to conclude that Weinreis was similarly situated to him because he points to nothing suggesting that Weinreis failed to "take ownership" of her problems.

Likewise, the other allegedly similarly-situated employees are different from Martinez in relevant ways. Martinez does not allege that Steve Davis, Garth Gonseth, or Jeremy Johnson refused to acknowledge or "take ownership" of their problems such that a PIP would not have been appropriate. Moreover, the problems with Gonseth were, according to Martinez, related to a "tense" branch environment, and Martinez alleges simply that the problems with Johnson were related to "failing to properly communicate" and "dissatisfaction" within the branch. These problems are not of the same magnitude as Martinez's, and Johnson was ultimately removed from his job. And although Martinez claims that Geoff Brown "was shocked and denied responsibility" for being condescending and yelling at employees, the document cited by Martinez to support this assertion references Brown's cooperation in changing employee attitudes about him. Further, it is not clear what position Brown held in 2004, the year after Timm replaced Brown as St. Paul branch manager with Martinez, and it is not clear who wrote the nearly illegible handwritten reviews of Brown. (Wandling Decl. Ex. AA) The only clue as to authorship is an illegible signature that does not appear to be Timm's.

Martinez also argues pretext because Grainger did not follow its own procedures in dealing with Martinez and because it "shifted its explanation of the employment decision." Martinez's procedures argument fails because the record cannot support the inference that any deviation from standard procedures was due to anything other than the unique circumstances of Martinez's case. His shifting-explanation argument is unsupported by the record. The record is undisputed as to why Timm began the LePage investigation: he was worried about Martinez's management style and how Martinez was dealing with overtime. Martinez argues that Timm's concern about his management style was fabricated because Schmidt testified that she did not complain about Martinez to Timm. In light of the comments by the other employees, this is not enough to support Martinez's assertion that "Timm lied" about why he started the investigation.

2. Salary

The Court next considers Martinez's compensation discrimination claim. Again, the Court assumes Martinez's prima facie case. Martinez's compensation claim is based on his argument that he was just at or below the target range for level II branches while no other branch managers were similarly paid. Martinez further argues that he was the manager of the sixth largest branch and was not paid commensurate with the branch's size. Grainger responds that the variation in branch manager salaries and Martinez's salary itself were based on the number of employees and sales volume. It has therefore articulated a legitimate, nondiscriminatory reason for the salary variation. As discussed above, the record supports neither Martinez's assertions about target salary ranges for the various branch levels nor his assertion that the St. Paul branch was the sixth largest. Instead, the only conclusion that may be drawn from this record is that the St. Paul branch was small and that Martinez was compensated with a salary above or on par with those of the managers of similarly-sized branches, namely, the St. Cloud, Minneapolis, Sioux

City, and Rochester branches. Moreover, from the moment he was promoted to manager of the St. Paul branch, Martinez was paid more than the Caucasian manager he replaced. Thus, a reasonable jury could not conclude that managers "similar in all relevant respects" to Martinez were paid more than he was.

Perhaps placing Martinez on a PIP would have been a justifiable business decision. This issue is not before the Court. Federal courts are not "super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995). Instead, the issue is whether Martinez came forward with sufficient evidence to allow a reasonable jury to conclude that Grainger discriminated against him because of his race or national origin. He has not. In addition to the discussion above, the Court notes that Timm hired Martinez, and there is no evidence suggesting that Grainger employs, as managers or otherwise, few minorities. This record simply contains no evidence that would allow a jury to conclude that Martinez was discriminated against because of his race or national origin.

**C.    Contract claim**

Martinez argues that Grainger breached the terms of a unilateral contract, acceptance of which was effected by Martinez's continual employment with Grainger. Martinez claims that Grainger was in breach of this putative contract by: (1) failing to provide appropriate notice of deficiencies relative to his performance; (2) demanding that Martinez admit the behavior in LePage's summary; and (3) violating Grainger's provisions against discrimination. Martinez points to no facts or argument that would allow a jury to conclude that Grainger made covenants consistent with his first two points. And the third argument fails because, even assuming an

employee can make a contract claim based on alleged discrimination, Martinez's discrimination claim fails as discussed above.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Grainger's motion for summary judgment [Docket No. 20] is GRANTED.

2. The Complaint is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: January 13, 2011

s/ Joan N. Ericksen<br>
JOAN N. ERICKSEN<br>
United States District Judge